**Claire BILIDA, Plaintiff,**

v.

**Andrew McCLEOD, in his capacity as Director of the Department of Environmental Management, Officer Jeffrey S. Belmonte, and Officer Sheila DiSarro, Deputy Chief Thomas Greene, and State of Rhode Island, Defendants.**

**No. CIV. A. 96–621L.**

United States District Court, D. Rhode Island.

Jan. 21, 1999.

tional support (docket No. 51).

Linda S. MacDonald, MacDonald–Glenn & Associates, E. Greenwich, RI, John Michael Verdecchia, Providence, RI, for Plaintiff.

James R. Lee, Brenda A. Doyle, Attorney General's Office, Providence, RI, for Defendants.

## MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

Claire Bilida ("plaintiff") rescued an orphaned racoon and raised the animal as her family's pet. Mia, the racoon, lived unremarkably for at least seven years in a wire cage attached to the back of plaintiff's house in Warwick, Rhode Island. That ended August 8, 1995 when the racoon was seized by officers of the Department of Environmental Management ("DEM"), Jeffrey Belmonte and Sheila DiSarro (the "DEM Officers" or "the Officers").

The Officers had been called to the house after a Warwick police officer responded to a silent security alarm and saw the caged racoon. Because an epidemic of rabies was then threatening Rhode Island, the DEM Officers told plaintiff that they would seize the animal. Plaintiff objected. She claims the Officers assaulted her and were excessively rough with the pet that she loved. She also claims that the Officers promised to keep the racoon alive. That day, the DEM summarily euthanized "Mia" and found that she was not infected by the rabies virus.

Plaintiff filed this action against Belmonte, DiSarro, Andrew McLeod, in his capacity as Director of DEM, DEM Depu-

ty Chief Thomas Greene and the State of Rhode Island. In her Complaint, plaintiff alleges that defendants violated her right to privacy, violated her due process rights, and perpetrated an unreasonable search, all in contravention of the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution (Count I); that defendants violated her state right to privacy created by R.I. Gen. Laws § 9–1–28.1 (Count II); that defendants intentionally inflicted emotional distress upon her (Count III); that defendants negligently inflicted emotional distress upon her (Count IV); that defendants committed the tort of conversion (Count V); that defendants committed assault and battery upon her (Count VI); and that defendants are guilty of malicious prosecution and false arrest (Count VII). Plaintiff requests compensatory damages and, in Count VIII, punitive damages. The case is before this Court on defendants' motion for summary judgment.

This case turns on a security alarm and a state license. Plaintiff had the first and not the second. A silent alarm brought a Warwick police officer to plaintiff's home on August 8, 1995. That officer legally searched plaintiff's premises and saw the racoon in plain view, and the subsequent searches by the Warwick Animal Control Officer and the DEM Officers were incidental to the original search. A state license is necessary to keep a racoon for breeding or any other purpose. Because plaintiff did not have a license, the racoon was contraband. Although "Mia" was undoubtedly a cherished pet, she was not property under the law of Rhode Island. Therefore, plaintiff had no property interest in the racoon, and "Mia"'s seizure and death were not protected by the Fourth, Fifth or Fourteenth Amendments.

As discussed below, defendants' motion for summary judgment is granted as to Count I which contains all the federal claims. The remaining seven counts should be heard, if at all, in state court,

and they are dismissed without prejudice pursuant to Fed.R.Civ.P. 12(b)(1).

## I. Facts

On August 8, 1995, DEM seized the Bilida family pet from a cage where she had lived for the previous seven years. The pet was "Mia," a racoon that plaintiff had rescued as an infant and raised entirely in captivity. Plaintiff alleges that some DEM employees had previously given her advice about how to care for a baby racoon and had approved of her possession.

DEM Officers Belmonte and DiSarro only appeared at plaintiff's home on Dryden Boulevard, Warwick because a Warwick police officer had stumbled across the racoon earlier that morning. Warwick Police Officer Kenneth Brierly ("the Police Officer"), who is not a party to this litigation, responded to a silent alarm at the house and found a racoon rather than a burglar. "Mia" lived in a wire cage attached to the Bilida house, where she had a pool and where she played with family members.

Brierly called the City's Animal Control Officer ("ACO") Nora Legault. On hearing that ACO Legault would not arrive for a half-hour, Officer Brierly left the Bilida house for a time and later returned to meet Legault there. Legault, who is not a party to this litigation, came and met plaintiff at the premises and asked if she had a DEM permit to possess a racoon. It is illegal to possess a racoon without a DEM permit in Rhode Island. At the time, there was an epidemic of rabies that had spread along the Atlantic coast to and including Rhode Island. DEM had a policy that racoons were a high-risk "target species" and that any racoon that had contact with a human being should be captured and tested for rabies. The test for rabies includes killing the animal.

Plaintiff told Legault that she had a permit but could not produce one, so Legault returned to her office, called DEM and determined that plaintiff, in fact, did not have such a permit. As a result of

Legault's call, DEM dispatched DiSarro and Belmonte to plaintiff's house at 11:30 a.m. Approximately two hours after Brierly discovered "Mia," the DEM Officers met plaintiff in her back yard. They told her that they would have to seize "Mia."

The parties dispute the actual events that occurred next. Plaintiff claims Belmonte grabbed her by the waist and pushed her away from Mia's cage. The DEM Officers allege that plaintiff climbed into the cage with "Mia" and tried to keep Belmonte from opening the door. Eventually, the Officers snared "Mia" and carried her away in a cage. Plaintiff claims Belmonte was overly rough with "Mia" and injured her as he snared her around the neck.

Once Belmonte and DiSarro had the racoon at the DEM barracks at Goddard Park, they contacted Deputy Chief Greene to ask him what they should do with "Mia." Greene called Rhode Island Public Health Veterinarian Susan Littlefield. On hearing that plaintiff fed "Mia" by hand, Littlefield told Greene that the state's rabies protocol called for the animal to be euthanized and tested for rabies. Greene related this information to Belmonte. Belmonte then confirmed that information with Littlefield directly. Thereafter, the racoon was euthanized and tested. "Mia" did not have rabies.

At plaintiff's home, DiSarro had issued plaintiff a summons for illegally possessing a racoon. On October 26, 1995, Belida pleaded nolo contendere to this charge. The plea was subsequently vacated. On April 22, 1996, a Superior Court judge filed the charge for one year on a not guilty plea.

## II. *Legal Standard for Motion for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on summary judgment motions:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Therefore, the critical inquiry is whether a genuine issue of material fact exists. "Material facts are those 'that might affect the outcome of the suit under the governing law.'" *Morrissey v. Boston Five Cents Sav. Bank*, 54 F.3d 27, 31 (1st Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). "A dispute as to a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

On a motion for summary judgment, the Court must view all evidence and related inferences in the light most favorable to the nonmoving party. *See Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.*, 133 F.3d 103, 106 (1st Cir.1997). At the summary judgment stage, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood." *Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835 F.2d 932, 936 (1st Cir.1987). Similarly, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.*, 777 F.Supp. 167, 169 (D.R.I.1991).

## III. *The Federal Constitutional Issues*

Count I is based on 42 U.S.C. § 1983 and violations of plaintiff's federal constitutional rights. Plaintiff characterizes them as her rights to privacy, to freedom from unreasonable search and seizure and to due process. The first is specious. The second and third, although arguable, are unfounded because the racoon was found

in plain view and because plaintiff had no property interest in the racoon.

## A. *No Federal Right To Privacy Was Violated*

 Plaintiff alleges a violation of her federal right to privacy, but neither party briefed this issue in its filings. Simply put, there is no federal constitutional right for an individual to keep police from knowing she has a racoon in the back yard. "The Supreme Court has inferred a federal constitutional right to privacy from various Bill of Rights protections and from the basic guarantee of fairness that the Due Process Clause of the Fourteenth Amendment provides. This right to privacy is actually more a right to personal autonomy than a right to keep certain information secret." John C. Barker, Note, *The Private Workplace, Under The Federal And California Constitutions*, 19 Hastings Const. L.Q. 1107, 1110 (1992).

No violation of plaintiff's so-called federal right to privacy has been shown in this case.

## B. *The Warrantless Search and Seizure Was Legal*

 The second constitutional issue raised is that the DEM Officers conducted a warrantless search of plaintiff's property. Nonconsensual entries by government agents into a residence without a search or arrest warrant are presumptively unreasonable under the Fourth Amendment, *see McCabe v. Life–Line Ambulance Service, Inc.*, 77 F.3d 540, 544 (1st Cir.1996), and that constitutional protection applies in civil cases, *see id.* There is no question that the Warwick Police Officer was justified in entering the back yard in response to the silent security alarm. The Police Officer was checking the house for signs of a burglary, and both Mia and her cage were in plain view against the house. However DiSarro and Belmonte arrived almost two hours later, when the alarm had ceased ringing and everyone knew no burglary was underway. The issue is whether the subsequent search and seizure by the DEM Officers falls under any exception to the Fourth Amendment's warrant requirement. Defendants argue that the search fell within two exceptions: exigent circumstances and plain view. This Court concludes that only the latter exception is applicable here.

### 1. *Exigent Circumstances*

 The First Circuit follows the standard rule that a warrantless search can be reasonable in emergency situations:

> [A] warrantless entry and search of a residence may be "reasonable," in Fourth Amendment terms, if the government can demonstrate certain exceptional types of "exigent circumstances": (1) "hot pursuit" of a felon into a residence; (2) imminent destruction of evidence within the residence; (3) a threatened and potentially successful escape by a suspect from inside the residence; or (4) an imminent threat to the life or safety of members of the public, the police officers, or a person located within the residence. Normally, "exigent circumstances" exceptions—by their very nature—turn upon the objective reasonableness of *ad hoc*, fact-specific assessments contemporaneously made by government agents in light of the developing circumstances at the scene of the search.

*McCabe*, 77 F.3d at 545 (citations omitted). *See also United States v. Wihbey*, 75 F.3d 761, 766 (1st Cir.1996).

 Whether exigent circumstances exist in a given set of circumstances is an issue of law for the Court to decide. Despite plaintiff's contention, this is not an issue of fact for a jury. Although the parties obviously disagree about the threat posed by "Mia," plaintiff cannot survive summary judgment merely to put the issue of exigent circumstances to a jury. This Court will decide whether the DEM Officers faced exigent circumstances when they arrived at plaintiff's house.

Defendants appear to contemplate two ways in which exigent circumstances could exist in this case. First, the DEM Officers may have thought the racoon, even in its cage, constituted an imminent threat to life or safety. Second, the DEM Officers may have thought plaintiff planned to spirit the racoon away, removing evidence and creating an imminent threat to life or safety.

 Plaintiff correctly notes that the racoon was not an imminent threat to life or safety while it was in its cage. "Mia" showed no sign of rabies, and plaintiff told the DEM Officers that "Mia" was a family pet who had lived in the cage for years. There was no risk of escape, no imminence to any perceived danger. Defendants now argue that holes in the racoon's cage created an "everpresent risk" that a child or pet could come in contact with the racoon. That was always a possibility, but imminent danger requires a higher standard than the mere possibility that someone might be injured. *See, e.g., United States v. Curzi*, 867 F.2d 36, 42 (1st Cir.1989) (no exigent circumstances where public safety was threatened by the presence of a wanted man with a history of violence and accompanied by an "anarchic" gang of fellow fugitives). In *Curzi*, the First Circuit emphasized that a two-hour delay in conducting the search was evidence against the government's claim:

> The simple fact of the matter is that each and all of the claimed extenuations existed from the time the FBI tracked Williams to 4248 W. 22d St. At the latest, the agents' relevant knowledge was complete by 8:30 a.m. on the morning of the search. That they waited for almost two hours before bringing the operation to its planned climax belies the government's contention that the risks were such as would "not brook the delay of obtaining a warrant."

*Id.*, 867 F.2d at 42.

In this case, it is equally obvious that the government officials on the scene saw no exigent circumstances. The Warwick Police Officer left the scene after seeing the racoon and only returned when ACO Legault arrived. Similarly, Legault left the scene to call DEM from her office to learn whether plaintiff had a license for "Mia." The license is important to this case, but if a caged racoon is an *imminent threat* then it would be irrelevant whether it is licensed or unlicensed. There was no imminent danger in leaving the racoon in its cage long enough to obtain a warrant. Therefore, this Court finds that the presence of a caged racoon was not, by itself, an exigent circumstance.

Plaintiff also correctly notes that her exclamation to the DEM Officers did not create exigent circumstances. Taking the facts in the light most favorable to plaintiff, it is undisputed that she said "why don't they go down and get a pot of coffee." (*See* Pl.'s Deposition at 154–55). Defendants argue that plaintiff's remark made it objectively reasonable for the Officers to believe that plaintiff intended to leave the scene with the racoon if they departed. Removing the racoon from its cage would both remove evidence and create an imminent threat to life or safety. However, the DEM Officers did not seize the racoon in reaction to plaintiff's comment. Both Belmonte and DiSarro have testified under oath that they went to plaintiff's home to seize the racoon. (*See* Tr. of Officer Belmonte's Suppression Hearing Testimony at 42–44; Deposition of Officer DiSarro at 31–32.) The DEM Officers intended to seize the racoon before they even met plaintiff, and there is no evidence that they were motivated by an objective or subjective belief that the racoon would be spirited away. *See Curzi*, 867 F.2d at 42 n. 5 (noting that government officials could not argue they were motivated by a circumstance if there is no evidence the circumstance motivated them at the time).

Therefore, this Court determines that no exigent circumstances existed that justified an exception to the warrant requirement.

### 2. *Plain View*

The First Circuit has been clear in outlining the "plain view" exception:

> Law enforcement agents may seize evidence in plain view during a lawful search even though the items seized are not included within the scope of the warrant. To fall within the "plain view" doctrine, a seizure must satisfy two criteria: first, the officers' presence at the point of discovery must be lawful, and second, the item's evidentiary value must be immediately apparent to the searchers.

*United States v. Robles,* 45 F.3d 1, 6 (1st Cir.1995) (citations omitted). The second prong has been explained to mean that the officers' "discovery of the object must so galvanize their knowledge that they can be said, at that very moment or soon thereafter, to have probable cause to believe the object to be contraband or evidence." *United States v. Rutkowski,* 877 F.2d 139, 142 (1st Cir.1989).

In this case, it is the DEM Officers' presence that is at issue. Defendants argue that DiSarro and Belmonte's search was an extension of the Warwick Police Officer's search. Certainly, that Police Officer was legally on plaintiff's property in response to the security alarm, and it was objectively reasonable for him to assume that a racoon had evidentiary value in the midst of a rabies epidemic. Defendants rely on cases in which fire marshals found evidence while investigating the cause of a fire. *See, e.g., United States v. Green,* 474 F.2d 1385, 1387–91 (5th Cir.1973) (secret service agent's warrantless entry and seizure of counterfeit plates was legal where fire marshal discovered the evidence while investigating the cause of a fire).

The Warwick Police Officer could have searched plaintiff's back yard and immediately seized the racoon under the plain view exception. His presence was lawful because he was investigating the burglar alarm, and the sight of *any caged racoon* would have given him probable cause to believe that the racoon was evidence or contraband. It is clear that racoon licenses were rarely issued and that in the midst of the 1995 rabies epidemic, none were being approved. The rarity of licenses and the prohibition against unlicensed racoons would give a police officer probable cause to believe that the racoon was unlicensed and that it was contraband itself and evidence of a crime by the property owner. The Police Officer did not need proof that the specific racoon was unlicensed, merely that probable cause existed that the racoon had evidentiary value or was contraband. *Compare United States v. Aguirre,* 839 F.2d 854, 858–59 (1st Cir. 1988) (evidentiary value of keys was apparent where they had Ford emblem and were in an apartment reasonably believed to be used by a drug gang that used a Ford truck) *with Rutkowski,* 877 F.2d at 142–43 (evidentiary value of precious metal was not apparent where possession of platinum is not illegal and postal inspector could not immediately identify metal as platinum).

A delay between the initial observation and eventual search or seizure under the plain view doctrine is analyzed under a test of reasonableness consistent with other Fourth Amendment analysis. *See Emery v. Holmes,* 824 F.2d 143, 148 (1st Cir.1987). Plaintiff argues that the two-hour delay for the DEM Officers to arrive hewed their search from the original Warwick Police Officer's search. However, it was eminently reasonable for the Warwick Police Officer to delay the seizure for two hours. First, police officers are not equipped or trained to seize a racoon, so it was reasonable for him to call in the Animal Control Officer and DEM Officers to move the animal. Second, a police officer who could legally seize property can reasonably delay for two hours to confirm that the property is evidence or contraband so it was reasonable to wait to confirm that the racoon was unlicensed.

The DEM Officers completed a seizure after a legal search begun by the Warwick Police Officer. Neither the two-hour delay nor the use of DEM Officers created any greater imposition on plaintiff's Fourth Amendment rights than the initial intrusion into the back yard by the Warwick Police Officer. In fact, the delay—if "Mia" had actually been licensed—would have eased the imposition because the Police Officer, who could have legally seized the racoon immediately based on probable cause that it was evidence or contraband, would have left the animal in its cage.

Therefore, this Court concludes that the search and seizure were legally made based on the plain view exception to the warrant requirement. The Police Officer was legally in plaintiff's back yard to respond to a burglar alarm, and there was probable cause to believe that "Mia" was evidence or contraband. The two-hour delay to check the racoon's license status and to locate DEM Officers was reasonable. No violation of the Fourth Amendment occurred.

### C. The Seizure and Destruction Were Legal

The third constitutional violation alleged is a due process claim. Plaintiff claims that when defendants summarily euthanized "Mia" to test her brain for the rabies virus, she was denied her due process rights. However, there was no constitutional violation because the racoon was contraband. Plaintiff had no property interest in the animal, and therefore, she had no right to due process as provided in the Fifth and Fourteenth Amendments.

To prevail on a due process claim, plaintiff must have been deprived of a property interest recognized by state law. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Marrero–Garcia v. Irizarry,* 33 F.3d 117, 121 (1st Cir.1994). This doctrine limits the Court's power in cases such as this. The state is given the power to define property, and even where addi-

tional process might be laudable, this Court cannot create constitutional protection for objects that the state has declared illegal to possess.

In order to keep any live racoon in Rhode Island, an individual must have a permit or license issued by DEM. *See* R.I. Gen. Laws § 20–16–5. In order to even possess a wild racoon, an individual must obtain a permit from DEM. *See* R.I. Gen. Laws § 4–18–3. Therefore, it was illegal for plaintiff to have the racoon on her premises. It is undisputed that "Mia" was a family pet, was raised from an infant and was cherished by plaintiff. However, the racoon was not property under Rhode Island law. She was per se contraband, an object that when possessed constitutes a crime. *See United States v. Farrell,* 606 F.2d 1341, 1344 (D.C.Cir.1979) (defining per se contraband) (citing *One 1958 Plymouth Sedan v. Com. of Pennsylvania,* 380 U.S. 693, 699, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965)). In *One 1958 Plymouth,* the Supreme Court noted that illegal narcotics and an unlicensed still were both per se contraband. *See One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. at 698–99, 85 S.Ct. at 1249–50. The unlicensed racoon in this case was identical under the law to an unlicensed still.

Plaintiff alleges a right to the racoon under common law doctrines that gave people ownership over wild animals that they have captured or trapped. *See Pierson v. Post,* 3 Caines 175, 2 Am. Dec. 264 (N.Y.1805). However, that common law doctrine is supplanted by the Rhode Island statute that explicitly bans ownership of a wild racoon unless DEM issues a license.

Therefore, plaintiff had no property interest in the racoon. She is undoubtedly right that a hearing might have convinced the state officials to spare "Mia's" life. However, she can claim no due process violation even when the racoon was taken from her and destroyed.

## IV. *The Remaining Claims Should Be Heard in State Court*

 Counts II, III, IV, V, VI, VII and VIII do not arise from or under federal law. They are state-law claims, and this Court could consider them only under supplemental jurisdiction. The relevant statute states that:

"in any civil action over which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action ... that they form part of the same case or controversy.

28 U.S.C. § 1367(a). This Court has power to hear both state and federal claims if they would ordinarily be expected to try them all in one judicial proceeding. *See Penobscot Indian Nation v. Key Bank of Maine,* 112 F.3d 538, 563–64 (1st Cir. 1997); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.,* 79 F.3d 182, 190 (1st Cir.1996). In particular, "the state and federal claims must derive from a common nucleus of operative fact. *See Rodriguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1175 (1st Cir.1995).

 However, supplemental jurisdiction is discretionary. *See Penobscot,* 112 F.3d at 564; *Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 256–57 (1st Cir.1996). The district court should "take into account concerns of comity, judicial economy, convenience, fairness, and the like." *Penobscot,* 112 F.3d at 564. The statute explicitly says that a court may decline to exercise its discretion if it has dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3); *Penobscot,* 112 F.3d at 564. Because this Court, in effect, dismisses Count I containing all the federal claims at this juncture (*see* Section III), it declines to exercise supplemental jurisdiction over the remaining state claims.

Thus, Counts II, III, IV, V, VI, VII and VIII are dismissed without prejudice under Fed.R.Civ.P. 12(b)(1).

## CONCLUSION

This Court recognizes the loss of plaintiff's pet as a painful experience, made worse by the possibility that the state overlooked a quarantine that could have saved Mia's life. However, every tragedy does not produce a constitutional violation. Perhaps defendants were rude or inflexible, but that does not create an illegal seizure or a due process violation.

For the preceding reasons, defendants' motion for summary judgment is granted as to Count I. Counts II, III, IV, V, VI, VII and VIII are dismissed without prejudice for lack of subject matter jurisdiction. The Clerk will enter judgment for defendants forthwith as indicated above.

It is so Ordered.