# United States Court of Appeals
## For the First Circuit

No. 99-1263

CLAIRE BILIDA,

Plaintiff, Appellant,

v.

ANDREW McCLEOD, in his capacity as Director of the
Department of Environmental Management, OFFICER JEFFREY S.
BELMONTE, OFFICER SHEILA DiSARRO, DEPUTY CHIEF THOMAS GREENE,
and STATE OF RHODE ISLAND,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, U.S. District Judge]

Before

Torruella, Chief Judge,

Coffin, Senior Circuit Judge,

and Boudin, Circuit Judge

John M. Verdecchia with whom Law Offices of John M.
Verdecchia and Linda MacDonald-Glenn were on brief for
appellant.
Brenda A. Doyle, Special Assistant Attorney General, with
whom Sheldon Whitehouse, Attorney General for the State of Rhode
Island, was on brief for appellees.

BOUDIN, Circuit Judge. The sad history of this section 1983 case began in or around 1988 when Claire Bilida rescued an orphaned raccoon thereafter named "Mia." Bilida and her family raised the raccoon as a pet and kept her in a cage attached to the back of the family's home in Warwick, Rhode Island. Mia lived there for seven years until she was seized and destroyed in August 1995 by the Rhode Island Department of Environmental Management ("the Department") in the episode that provoked this suit for violation of Bilida's constitutional rights.

On August 8, 1995, a Warwick police officer named Kenneth Brierly entered Bilida's backyard in response to a security alarm signal. While investigating the alarm, which proved to be false, Brierly saw Mia in her cage. Uncertain whether possession of the raccoon was legal, he called Nora Legault, the city's animal control officer, and then left the premises. A half hour or so later, Legault and Brierly returned to find Bilida at home. Legault asked Bilida for her permit

from the Department, which is required under Rhode Island law for possession of raccoons and certain other animal species.[1]

Bilida told Legault that she had a permit but then was unable to produce one. Legault and Brierly departed and Legault returned to her office, called the Department, and discovered that Bilida did not have a permit. The Department then sent two of its officers (Jeffrey Belmonte and Sheila DiSarro) to Bilida's home where the officers--who had no warrant--entered Bilida's gated backyard and seized Mia after a struggle with Bilida. DiSarro then issued Bilida a summons for illegally possessing a raccoon but (according to Bilida) the officers promised her that Mia would not be killed.

Having taken the racoon, the officers then consulted with the deputy chief of the Department, Thomas Greene, and he in turn contacted Susan Littlefield, the state's public health veterinarian. Littlefield, after learning that Mia had been hand fed by Bilida, told Greene that according to the state's rabies protocol, Mia had to be euthanized and tested for rabies. The protocol, which was adopted in response to a supposed epidemic of raccoon rabies moving up the east coast in the early

_____

[1]A statutory provision enacted in 1971 prohibits possession without a permit of certain wild animals, including the family to which racoons belong. R.I. Gen. Laws § 4-18-3 (1998); see also id. § 20-16-5 (1997). The current relevant regulations are in R.I. Code R. 12 080 043.

1990s, calls for animals in certain high risk "target species" to be tested for rabies (which requires killing the animal) under specified circumstances.[2] With no further word to Bilida, Mia was then shot, tested, and found to have no rabies infection.

Bilida was prosecuted in state court for the misdemeanor offense of possessing the raccoon without a permit. R.I. Gen. Laws § 20-1-16 (1998). In the state proceeding, Bilida obtained an evidentiary hearing on whether the final warrantless entry onto her property and seizure of the raccoon violated the Fourth Amendment made applicable to the states through the Fourteenth Amendment. The state court judge found that the officers had acted in good faith but also concluded that they had violated the Fourth Amendment because no exigent circumstances justified the warrantless entry and seizure of the already caged animal. Following the suppression order, the state abandoned the prosecution of Bilida.

---

[2]R.I. Rabies Control Board, Rules & Regulations Governing Rabies Control Within the State of Rhode Island §§ 2.00(b), 7.01 (rev. ed. Nov. 1994). Whether the nature of Bilida's exposure to Mia required euthanizing the raccoon is not entirely clear from the language of the protocol; it refers inter alia to cases of possible exposure "via . . . saliva . . . and . . . [a] pre-existing break in the skin . . . ." There is no indication whether Bilida's feeding or handling of Mia resulted in such exposure.

Bilida filed her own complaint in the federal district court, naming as defendants the director of the Department, deputy chief Greene, the two officers who had made the seizure (Belmonte and DiSarro), veterinarian Littlefield (later dismissed by consent), and the State of Rhode Island. She asserted federal claims under 42 U.S.C. § 1983 for violations of her constitutional rights of "privacy," due process, and protection against unreasonable search and seizure.[3] The complaint sought a declaration that Bilida's rights had been violated, punitive damages, and other unspecified relief.

In a thoughtful opinion, the district court granted the defendants' motion for summary judgment, holding that no federal right of privacy was violated; that the warrantless search and seizure were justified by the "plain view" exception to the warrant requirement; and that Bilida had no property interest in Mia to trigger a right to due process pertaining to Mia's treatment. Bilida v. McCleod, 41 F. Supp. 2d 142 (D.R.I. 1999). The district court dismissed the state claims without prejudice. 28 U.S.C. § 1367(c)(3) (1994). On this appeal, Bilida's main arguments are that preclusion doctrine required a finding that

---

[3]Companion state claims were made for invasion of privacy, intentional and negligent infliction of emotional distress, conversion, assault and battery, malicious prosecution, and false arrest.

the search and seizure were illegal and that in any event the district court erred in its legal rulings on the plain view and property issues.

Rhode Island law determines whether the state ruling in the criminal case is to be given preclusive effect in the federal action.  28 U.S.C. § 1738 (1994); <u>Allen</u> v. <u>McCurry</u>, 449 U.S. 90 (1980).  In general, Rhode Island law requires for collateral estoppel ("issue preclusion" in modern terms) that the issue earlier determined must have been identical to the issue raised in the later action, actually litigated, and necessarily decided; that the prior proceeding resulted in a final judgment on the merits; and that the party against whom issue preclusion is asserted or someone with whom he is in privity was a party to the prior proceeding.  <u>State</u> v. <u>Jenkins</u>, 673 A.2d 1094, 1096 (R.I. 1996); <u>E.W. Audet & Sons, Inc.</u> v. <u>Firemen's Fund Ins. Co.</u>, 635 A.2d 1181, 1186 (R.I. 1994); <u>see also</u> <u>Restatement (Second) of Judgments</u> § 27 (1982).

We agree that the issue--the legality of the search and seizure--is the same in both cases, and it is no bar to preclusion that the rulings were made in different courts and that the prior case was criminal while the latter was civil. <u>See</u> <u>Glantz</u> v. <u>United States</u>, 837 F.2d 23, 25 (1st Cir. 1988). Whether a final judgment exists might be debated since we are

-6-

dealing with an intermediate ruling that led simply to an abandonment of the prosecution, but Rhode Island may not be rigid as to this requirement, see State v. Presler, 731 A.2d 699, 702-04 (R.I. 1999). However, none of the defendants other than the State of Rhode Island was a party to the criminal proceeding, and we doubt that a Rhode Island court would deem those individual defendants in privity with the state insofar as they are now being sued in their individual capacities.

Although no Rhode Island case in point has been cited to us, most precedent indicates that individual state officials are not bound, in their individual capacities, by determinations adverse to the state in prior criminal cases. E.g., Kraushaar v. Flanigan, 45 F.3d 1040, 1050 (7th Cir. 1995); see generally 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4458, at 508 (1981). The reason is that the interests and incentives of the individual police or officials are not identical to those of the state, and the officers normally have little control over the conduct of a criminal proceeding.[4] Thus, whether there was a violation remains an open issue.

---

[4]As for the state, it cannot be held liable under section 1983. Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989). Nor can officers be sued in their official capacities for the relief sought here: damages and a declaration regarding past violations of law. Will, 491 U.S. at 71; Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993).

We turn therefore to the merits. The Fourth Amendment protects against "unreasonable" searches and seizures and, broadly speaking, an unconsented-to, warrantless entry into the home by government agents is presumptively unreasonable--valid only if an exception to the warrant requirement applies. McCabe v. Lifeline Ambulance Serv., Inc., 77 F.3d 540, 544 (1st Cir.), cert. denied, 519 U.S. 911 (1996); see generally 1 LaFave, Search and Seizure § 2.3, at 465 (3d ed. 1996). Places adjacent to the home, known as "curtilage," have generally been subject to the warrant requirement so far as the government agent intrudes beyond areas (e.g., the path to the front door) where uninvited visitors are expected. See 1 LaFave, supra, § 2.3(f), at 504-09; Daughenbaugh v. City of Tiffin, 150 F.3d 594, 603 (6th Cir. 1998).

In general, this warrant requirement applies to civil as well as criminal searches, Soldal v. Cook County, 506 U.S. 56, 66-67 & n.11 (1992), and whether the entry is by the police or some other government official, Michigan v. Tyler, 436 U.S. 499, 504-05 (1978). Civil "administrative" entries and investigatory searches, especially into business premises, have sometimes been upheld based on a regulatory scheme in lieu of a judicial warrant. See, e.g., Griffin v. Wisconsin, 483 U.S. 868, 873 (1987); United States v. Biswell, 406 U.S. 311, 314-15

(1972); McCabe, 77 F.3d at 545; see also 4 LaFave, supra, §
10.1(c).  But the defendants have not relied upon such an
administrative scheme in this case.[5]

The defendants argue in this case that the presumptive
warrant requirement was overcome by linking together several
settled exceptions.  They claim, and the district court held,
that the original entry of Officer Brierly was justified as an
exigent circumstance, viz., the security alarm signal that he
was investigating; that Mia was then noticed by Brierly and
subject to a seizure without a warrant under the "plain view"
doctrine; and that the later entry into the backyard by Belmonte
and DiSarro and their seizure of the raccoon was an extension of
Brierly's earlier entry and sighting of the raccoon and did not
need to be independently supported by a warrant.

Warrantless entries are most often justified by
"exigent circumstances," the best examples being hot pursuit of
a felon, imminent destruction or removal of evidence, the
threatened escape by a suspect, or imminent threat to the life
or safety of the public, police officers, or a person in

---

[5]There now appears to be a scheme under Rhode Island law for
warrantless searches of property where target species are kept
pursuant to a state-issued permit, see R.I. Code R. 12 080 043,
§ 2.2(f); 12 080 045, § 3.7 (1997), but even if there was a
comparable scheme in 1995, it may not have applied to Bilida
(ironically because she did not hold a permit).

residence.  See McCabe, 77 F.3d at 545.  Brierly's entry into the backyard in response to the silent security alarm is a perfectly good example of a perceived imminent threat, and Bilida herself does not claim that Brierly's initial entry was unjustified.

Once Brierly was in the backyard, he was entitled under the plain view doctrine to seize "contraband . . . left in open view and . . . observed . . . from a lawful vantage point . . . ."  Minnesota v. Dickerson, 508 U.S. 366, 375 (1993) (citations omitted).  The rationale is that assuming an initial lawful entry, the view "from a lawful vantage point" involves no further intrusion on privacy and the "warrantless seizure of [the] contraband" is justified because seeking a warrant "would often be impracticable" and, in any event, "would do little to promote the objectives of the Fourth Amendment."  Id.  If Belmonte and DiSarro were lawfully in Bilida's backyard, arguably the plain view doctrine would have permitted Mia's seizure, at least once lack of a permit was established.

However, the Supreme Court has said that where a search is lawful only because of exigent circumstances, the search must be "strictly circumscribed by the exigencies which justified its initiation."  Terry v. Ohio, 392 U.S. 1, 25-26 (1968); see also Mincey v. Arizona, 437 U.S. 385, 393 (1978).  The original

-10-

concern about the silent alarm had entirely dissipated when Belmonte and DiSarro returned to the property, well after Brierly's second departure, to seize the racoon. It is hard to see why a <u>new</u> entry, after the legally entering officer has left the premises and for a quite different purpose, should avoid the warrant requirement, absent some new exigent circumstance or other excuse for failing to get a warrant.[6]

We cannot be certain how the Supreme Court would view this matter since <u>Michigan</u> v. <u>Tyler</u>, 436 U.S. 499 (1978), sends conflicting signals. There, firefighters entered a burning building, extinguished a fire and seized some evidence in plain view. But darkness, heat and steam prevented a complete investigation into the cause of the fire, and the fire investigators returned a few hours later and seized additional items in plain view. The Supreme Court upheld this second entry, seemingly because of the continuing urgent need to determine the cause of the fire so as to rule out the risk of

---

[6]<u>Accord</u>, <u>e.g.</u>, <u>DiCesare</u> v. <u>Stuart</u>, 12 F.3d 973, 978 (10th Cir. 1993); <u>Middleton</u> v. <u>Indiana</u>, 714 N.E.2d 1099, 1102 (Ind. 1999) ("Once police officers leave a home where they believe they saw evidence in plain view, they are essentially in the same position as any officer with reliable information . . . . In the absence of exigent circumstances or one of the other recognized exceptions, the proper measure . . . is to obtain a warrant."); <u>cf.</u> <u>Mann</u> v. <u>Cannon</u>, 731 F.2d 54, 60 (1st Cir. 1984) (approving reentry where initial danger remained largely unabated).

recurrence, and they treated the seizure of plain view evidence as merely incidental.  See id. at 510-11.

Given the proximity in time and purpose between the initial search and valid reentry, Tyler has encouraged courts to consider multiple factors in deciding whether there are two separate searches or merely a continuing one justified by the original exigency; and this inquiry may sometimes make sense. Cf. Mann v. Cannon, 731 F.2d 54, 59-60 (1st Cir. 1984) (citing Michigan v. Clifford, 464 U.S. 287 (1984)).  But where the justification for the original warrantless entry has completely expired and the officials have left, we see no basis in Tyler or in constitutional policy for any general rule that officials can then reenter without a warrant simply to seize contraband or evidence that was seen in plain view during the original entry.

The best that can be said for the broader reading of Tyler is that when privacy has already and only recently been breached by the original entry, it is already "lost."  Cf. Vance v. United States, 676 F.2d 183, 188 n.8 (5th Cir. 1982).  But for most people, especially in the case of a private residence, a second entry is independently disagreeable.  Of course, the first entry and the plain view sighting may provide the police with ample basis for securing a warrant; but warrants from a neutral magistrate are normally required, absent an exigency,

-12-

even where the evidence supporting probable cause is overwhelming. See Thompson v. Louisiana, 469 U.S. 17, 21-22 (1984) (per curiam) (a two-hour search of home on same day after a legal entry not justified by diminished expectation of privacy); Mincey, 437 U.S. at 391.

In the district court, the defendants urged two other supposed exigencies to justify their warrantless entry and seizure: a public health emergency posed by the caged raccoon and an imminent realistic threat that the "evidence" would otherwise be secreted or destroyed. The district judge thought that neither of these grounds, although permissible in the abstract, were made out by the circumstances of this case and the defendants do not seriously urge them in this court. That is enough for purposes of this appeal.

In this court, Bilida's other substantive federal claim is that the seizure and destruction of Mia violated Bilida's due process rights (the complaint's generalized "privacy" claim has not been pursued on this appeal). Bilida's brief presents a short argument as to why Bilida should be regarded as having a sufficient property interest in the raccoon to entitle her to due process and she suggests that at the very least she was entitled to some kind of notice and a hearing before Mia was destroyed.

While the state might have more to say in its favor in a full-scale trial, it is not apparent why Mia should have been destroyed without providing Bilida an opportunity to object and obtain some kind of administrative review or judicial intervention. Seemingly, no state law required Mia's immediate destruction, and an administrative policy--even if one applied here, see note 2, above--can always be waived or modified. There is no indication of a genuine emergency, such as the biting of a child by an apparently rabid dog. And Bilida says she was told that Mia would not be killed.

Nevertheless, the due process clause protects "property" interests; and while the notion of property interest has been stretched quite far in certain contexts, e.g., Goldberg v. Kelly, 397 U.S. 254 (1970), it depends importantly on what interests are recognized under state law. See Board of Regents v. Roth, 408 U.S. 564, 577 (1972); Marrero-Garcia v. Irizarry, 33 F.3d 117, 121 (1st Cir. 1994). Citing these cases, the district court ruled that "even where additional process might be laudable," the court could not "create constitutional protection for objects that the state has declared illegal to possess." 41 F. Supp. 2d at 151.

A number of cases hold, as the district court did here, that a claimant has no property interest in "per se contraband,"

i.e., something that it is illegal merely to possess. E.g., Boggs v. Rubin, 161 F.3d 37, 40 (D.C. Cir. 1998), cert. denied, 120 S. Ct. 45 (1999); Lyon v. Farrier, 730 F.2d 525, 527 (8th Cir. 1984). Cf. One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 699 (1965). Because a raccoon taken from the wild cannot lawfully be possessed in Rhode Island without a permit, the district court deemed Mia to fall into the same category. With little enthusiasm, we agree with the district court that state law undermines Bilida's claim of the required property interest.

Under Rhode Island law, "wild game within a state belongs to the people in their collective sovereign capacity" and is not subject to "private ownership except in so far as the people may elect to make it so." State v. Kofines, 80 A. 432, 440 (R.I. 1911) (quoting Ex Parte Maier, 37 P. 402 (Cal. 1894)). State law makes illegal possession of raccoons taken from the wild without a permit issued by the Department. See note 1, above. This amounts to saying that, under state law, Mia could not be reduced to private ownership and lawfully possessed as property without a permit. Needless to say, this would be a different case if Bilida did have a permit, but she no longer claims ever to have had one.

We have concluded so far that Bilida does not have a valid claim based on procedural due process but might well have a valid Fourth Amendment claim. However, defendants say that even assuming a violation, the individual defendants are not liable for damages under section 1983 because of qualified immunity. (As already noted, the state is not liable for damages in any event.) The district court did not reach this issue because it rejected all of the constitutional claims on the merits.

Government officials are "shielded from liability for civil damages" under section 1983 unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The test is whether "under the circumstances that confronted the official, 'a reasonable official would understand that what he is doing violate[d] that right.'" Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir. 1998) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The question here thus is whether Belmonte and DiSarro should have known that their warrantless entry and seizure violated the Fourth Amendment.

Given the lack of clarity in prior precedent, we are satisfied that a reasonable government agent could easily have

believed that the final reentry and seizure of Mia was a protected extension of the original, lawful entry by Officer Brierly. The district court found that the final entry was lawful and, given <u>Tyler</u>, we have reached the contrary result only by a very close margin. Qualified immunity leaves "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." <u>Malley</u> v. <u>Briggs</u>, 475 U.S. 335, 341, 343 (1986). This might appear to dispose of the damage claims against the officers for the Fourth Amendment violation, but there is an unusual caveat.

Although qualified immunity normally turns on objective circumstances, not subjective intent, <u>Harlow</u>, 457 U.S. at 818-819, this likely means objective circumstances <u>actually</u> <u>known</u> to the officer, <u>see</u> <u>Anderson</u>, 483 U.S. at 641. If Belmonte and DiSarro knew nothing about Brierly's lawful entry and plain view perception, it might seem odd to grant them immunity based solely on the opacity of the law governing warrantless reentry. It is not clear that Belmonte and DiSarro knew the precise nature and timing of the prior searches, although they did know (according to testimony at the state suppression hearing) that the Warwick police and animal control officer had been at the scene.

However, Belmonte and DiSarro did know from the radio dispatcher that a superior officer, one Captain Tyler, had directed them to go to Bilida's address and seize the racoon. Belmonte so testified explicitly in deposition testimony that has not been challenged. Belmonte (and by attribution DiSarro) also knew that "the decision had already been made" to seize the racoon. Thus they were being directed not merely to "investigate" the subject but to seize a racoon at a specific address following an investigation by the police and animal control officer. In our view, these circumstances establish qualified immunity for these two officers, who were the only present individual defendants implicated in the seizure (as opposed to the destruction) of the animal.

Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (e.g. a warrant, probable cause, exigent circumstances).[7]  Here, there were no warning

_____

[7]Cf. United States v. Hensley, 469 U.S. 221, 232 (1985) (officers making stop in objective reliance on a bulletin issued by another department may have qualified immunity in civil suit even if there is not in fact reasonable suspicion). Compare Varrone v. Bilotti, 123 F.3d 75, 81 (2d Cir. 1997) (officers entitled to rely on superior's plausibly legal instructions), with Diamondstone v. Macaluso, 148 F.3d 113, 126 (2d Cir. 1998)

-18-

signs or bases for suspicion about the lawfulness of the order. On the contrary, Belmonte and DiSarro knew that the police and an animal control officer had recently been at the scene and that a racoon--a target species for rabies--was there. Upon receiving an explicit order to go to the home and seize the animal, they had every reason to think that Captain Tyler had secured a warrant or concluded (possibly based on exigent circumstances unknown to Belmonte and DiSarro) that one was unnecessary.

Qualified immunity shields the officers only from damage suits, cf. Rodi v. Ventetuolo, 941 F.2d 22, 31 (1st Cir. 1991), and Bilida explicitly seeks declaratory relief. But declaratory relief is discretionary, Ernst & Young v. Depositors Economic Protection Corp., 45 F.3d 530, 534-35 (1st Cir. 1995), and we are confident that the district court would rightly refuse any declaratory relief over and above that which this opinion affords. Our opinion establishes that, if the facts are as Bilida claims, the Fourth Amendment did not permit a warrantless entry and seizure of the racoon, at the time the racoon was actually seized, on the theory that this was a mere continuation of a prior lawful entry.

---

(officer could not rely on advice of superiors that was clearly contrary to law).

It is not perfectly clear that the facts are exactly as Bilida claims (in particular, the officers claimed at one point below that Bilida consented to the entry although not the seizure), but we cannot believe that a trial to resolve remaining factual questions could be justified merely to afford Bilida a declaratory judgment without any prospect of damage relief on the federal claim. Thus, we can conceive of no purpose for remanding this matter for further proceedings in federal court, although Bilida is entirely free to pursue her pendant state claims in state court. It need hardly be said that this outcome is not an endorsement of the state's procedures for treatment of pet racoons.

Affirmed.