Nagy v. Town of Andover, et al.      CV-01-112-M   10/19/01
UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Paul Nagy and Mary Ann Nagy,
      Plaintiffs


      v.                                    Civil No. 01-112-M
                                            Opinion No. 2001 DNH 191

Town of Andover, Seldon E.
Nason, Glenn E. Laramie, Jr.
Herbert L. Blish, David Hawes,
and Lee-Ann Hawes,
      Defendants


                         **O R D E R**


      Paul and Mary Ann Nagy ("the Nagys") have sued the Town of

Andover ("the Town"), three of its police officers (Officers

Sheldon Nason, Glen Laramie, and Herbert Blish), and their

neighbors, David and Lee-Ann Hawes ("the Haweses"), in six

counts.  Plaintiffs seek compensatory and punitive damages for

injuries allegedly inflicted upon them as a result of an unlawful

entry onto their property by three Andover Police Department

("APD") officers, which itself resulted from an alleged

conspiracy between the Haweses and Officer Nason.

The Nagys' suit consists of two federal claims, based upon alleged violations of their federally protected constitutional rights, see 42 U.S.C. § 1983, and four claims based upon state law, over which they ask the court to exercise supplemental jurisdiction. Before the court are: (1) two motions to dismiss the original complaint, one filed by the Town and the three police officers ("the Andover defendants") (document no. 11), the other by the Haweses (document no. 13); and (2) two motions to dismiss the Nagys' amended complaint (document no. 23 and document no. 24). The Andover defendants base their motions to dismiss on FED. R. CIV. P. 12 (b)(6) (dismissal for failure to state a claim), while the Haweses base their motions to dismiss on both Rule 12(b)(6) and FED. R. CIV. P. 12(b)(1) (dismissal for lack of subject matter jurisdiction). The Nagys object to all four motions. For the reasons given below, the two motions to dismiss the original complaint are moot and the two motions to dismiss the amended complaint are granted.

**Standard of Review**

A motion to dismiss for "failure to state a claim upon which relief can be granted," Fᴇᴅ. R. Cɪᴠ. P. 12(b)(6), requires the court to conduct a limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). When considering a motion to dismiss under Fᴇᴅ. R. Cɪᴠ. P. 12(b)(6), the court must "accept as true all well-pleaded allegations and give plaintiffs the benefit of all reasonable inferences." Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999) (citing Gross v. Summa Four, Inc., 93 F.3d 987, 991 (1st Cir. 1996)). Furthermore, "[d]ismissal under Fᴇᴅ. ʀ. Cɪᴠ. P. 12(b)(6) is only appropriate if the complaint, so viewed, presents no set of facts justifying recovery." Cooperman, 171 F.3d at 46 (citing Dartmouth Review v. Dartmouth College, 889 F.2d 13, 16 (1st Cir. 1989)).

3

## Background

The facts of this case, as derived from the amended complaint and viewed in the light most favorable to the Nagys, are as follows.

The Nagys and the Haweses are residential neighbors who share a common driveway. The Haweses operate a day-care service in their home. The shared driveway is located on the Nagys' property, but the Haweses own easement rights over a portion of it. In June 2000, Mr. Nagy ("Nagy") observed some of the Haweses' day-care customers driving too fast along the shared driveway. He spoke with them about it, and asked them to drive more slowly. Ms. Hawes ("Hawes") confronted Nagy about his confronting her customers and also reported him to the Andover Police Department ("APD") for allegedly blocking the shared portion of the driveway.

On August 30, 2000, Hawes again reported Nagy to the APD, this time for allegedly videotaping her children while they were

waiting for a school bus (activity she perceived to be harassing).  Officer Nason of the APD, a long-time personal friend of the Haweses, responded to the complaint.  After speaking with Nagy and, with Nagy's consent, looking at his videotape, Officer Nason determined that Nagy had not been videotaping the Hawes children but, instead, had been videotaping landscaping on his property, as he had claimed.

On September 14, 2000, Hawes had three additional communications with the APD.

First, at some unstated time, and in some unspecified context, Hawes told Officer Nason that "Mr. Nagy would be served with papers arising out of the dispute over the driveway and that [she and her husband] feared Mr. Nagy's reaction" (Am. Compl. ¶ 16).  (No such papers were ever actually served on Nagy.)

Second, Hawes reported to the APD that Nagy was driving up and down the driveway at a high rate of speed (which Nagy

denied). Officers Nason and Laramie responded to Hawes's call, but by the time they arrived, Nagy was gone. When Mr. Hawes informed the officers that Nagy was on his way to Franklin, the officers asked for assistance from the Franklin Police Department. Officers from Franklin located Nagy and reported that he was driving in a reasonable manner. When Nagy returned home, Officer Laramie informed him that he had been reported for erratic operation in the driveway. Nagy denied that he had been driving erratically, and told Officer Laramie that he intended to place a wooden speed bump in the shared driveway later that day. After Officer Laramie spoke with Nagy, he and Officer Nason drove their cruiser down the driveway and parked across the street, where they could keep an eye on what obviously was a developing hostile situation.

Third, at approximately 10:00 p.m., about an hour after Officer Laramie last spoke with Nagy, Hawes called the APD to report the sound of six gunshots coming from Nagy's home. At the time Hawes heard the sounds she identified as gunshots, Officers

6

Nason and Laramie were still parked across the street. Officers Nason, Laramie, and Blish all responded to Hawes's call. They drove up the driveway, exited their cruiser(s), and walked toward Nagy's barn. As they approached the barn, Nagy emerged, carrying a hammer. The officers shined a light in Nagy's face, unbuckled their holsters, and placed their hands on the butts of their guns. One of the officers ordered Nagy to "stop, drop what was in his hand, and place his hands in the air" (Am. Compl.¶ 22). Nagy complied. After Nagy dropped the hammer, Officer Nason asked a few questions and determined that no gunshots had been fired. Then Officer Nason ordered Nagy to remove two trucks and some lumber, which, in Officer Nason's view, were blocking the driveway. When Nagy initially refused to do so, Officer Nason threatened him with arrest for disorderly conduct. At that point, Nagy complied with the order and moved his vehicles and lumber.

Based upon the foregoing, the Nagys filed this suit. Count I asserts a federal claim, under 42 U.S.C. § 1983, in which the

7

Nagys claim that the Andover defendants violated their constitutional rights as guaranteed by the Fourth and Fourteenth Amendments to the U.S. Constitution by: (1) conducting an unreasonable search of their property; (2) unreasonably seizing Nagy; and (3) unlawfully coercing Nagy into moving his vehicles and lumber, under the threat of arrest. Count II asserts a tort claim under state law against the Town of Andover for negligently hiring, training, and supervising Officers Nason, Laramie, and Blish. Count III asserts a claim under state law against the Andover defendants for the officers' unlawful detention of Nagy. Count IV asserts a claim under state law against Officers Nason, Laramie, and Blish for trespass. Count V asserts a claim of conspiracy against Officer Nason and the Haweses, in which they are accused of agreeing to make false police reports and misuse Officer Nason's authority as a police officer in order to: (1) deprive the Nagys of their constitutional rights; and (2) inflict emotional distress upon them. Count VI asserts a tort claim under state law against Officer Nason and the Haweses for intentional infliction of emotional distress.

8

Shortly after the Nagys filed suit, the Andover defendants and the Haweses filed separate motions to dismiss for failure to state a claim. The Nagys responded by filing an amended complaint, which became the operative complaint in this case by order dated August 10, 2001 (document no. 22).

**Discussion**

As a preliminary matter, because the amended complaint is the operative complaint in this case, the two motions to dismiss the original complaint (document no. 11 document no. 13) are moot and relevant only to the extent that they have been incorporated, by reference, into the motions to dismiss the amended complaint.

In their motion to dismiss the amended complaint, the Andover defendants argue that the amended complaint: (1) contains unfair revisions and modifications; (2) fails to state a cause of action, because it is based upon unsupported speculation rather than factual allegations; and (3) fails to overcome the defense of qualified immunity. (Because the court has already accepted

9

the amended complaint as the operative complaint in this case, it does not consider the Andover defendants' argument concerning the unfairness of allowing the amended complaint.) The Haweses argue in their motion to dismiss that: (1) the Nagys have failed to state a valid federal claim against them; (2) dismissal of the federal claim against the Andover defendants will eliminate the basis for supplemental jurisdiction over the Nagys' state law claims; and (3) even if supplemental jurisdiction is proper, the Nagys have failed to adequately assert any state law claims.

In response, the Nagys restate their theory of the case, according to which the three Andover police officers violated their constitutional rights by responding to Hawes's report of gunshots because: (1) Hawes had a history of making false reports to the APD; and (2) on the evening in question, Officers Nason and Laramie heard sounds which they knew to be hammering, rather than gunshots, coming from the Nagys property, which gave them reason to know, with certainty, that Hawes's report of gunshots was false.

10

I.   Count I: The Nagys' § 1983 Claim

The Nagys' § 1983 claim fails because their factual allegations, even if true, do not describe a constitutional violation.[1]

In order to prevail on a § 1983 claim, a plaintiff must prove that one or more individual defendants, acting under color of state law, deprived him or her of a right, privilege, or immunity secured by the Constitution or laws of the United States.  See, e.g., Blessing v. Freestone, 520 U.S. 329, 340 (1997).  The Nagys claim that their rights, secured by the Fourth and Fourteenth Amendments to the United States Constitution, were violated when Officers Nason, Laramie, and Blish: (1) searched

_____

[1] Because the Nagys have failed to adequately allege a constitutional violation, the court need not reach the Andover defendants' arguments concerning qualified immunity.  See Wilson v. Layne, 526 U.S. 603, 609 (1999) (quoting Conn v. Gabbert, 526 U.S. 286, 290 (1999) ("A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'").

11

their property; (2) seized Nagy; and (3) coerced him into moving his trucks and lumber. The court does not agree.

The Nagys' first two claims, concerning the search of their property and the seizure of Nagy, may be disposed of on a straightforward Fourth-Amendment analysis. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ." U.S. CONST. amend. IV. "[B]roadly speaking, an unconsented-to, warrantless entry into the home by government agents is presumptively unreasonable – valid only if an exception to the warrant requirement applies." Bilida v. McCleod, 211 F.3d 166, 171 (1st Cir. 2000) (citing McCabe v. Lifeline Ambulance Serv., Inc., 77 F.3d. 540, 544 (1st Cir. 1996); 1 LaFave, Search and Seizure § 2.3, at 465 (3d ed. 1996)). "Places adjacent to the home, known as 'curtilage,' have generally been subject to the warrant requirement so far as the government agent intrudes beyond areas (e.g., the path to the front door) where uninvited visitors are expected." Bilida, 211 F.3d at 171 (citing 1 LaFave

§ 2.3(f), at 504-09; <u>Daughenbaugh v. City of Tiffin</u>, 150 F.3d 594, 603 (6th Cir. 1998)).  "Warrantless entries are most often justified by 'exigent circumstances,' the best examples being hot pursuit of a felon, imminent destruction or removal of evidence, the threatened escape by a suspect, or imminent threat to the life or safety of the public, police officers, or a person in residence."  <u>Bilida</u>, 211 F.3d at 171 (citing <u>McCabe</u>, 77 F.3d at 545).

Here, Officers Nason, Laramie, and Blish were presented with exigent circumstances fully justifying their warrantless entry onto the Nagys' property and their brief seizure of Nagy.  Even if some or all of the officers were parked in front of the Nagys' residence and recognized the sound of hammering, still the Nagys enjoy no constitutional right to have the officers disregard a citizen's report of gunshots.  Given the recent history of personal animosity between the Nagys and the Haweses, the recent escalation of that animosity, and the potential for serious injury caused by gunfire, it would have been unreasonable, even

13

irresponsible, for the officers to have responded in any way other than as they did. They entered onto the Nagys' property in response to a report of gunshots. They followed a path any uninvited visitor might follow, proceeding directly to Nagy's location (the barn) to make appropriate inquiries, and searched only so much of the property as was necessary to determine that no shots had been fired. The officers "seized" Nagy only for a limited time and to the limited degree necessary to insure that he was not armed, and posed no threat to them or to others. On the facts alleged by the Nagys, the police were not only within their rights, but were obligated to investigate Hawes's report of gunshots.[2] Because the officers' warrantless search and seizure

---

[2] In this regard, the court notes that the facts alleged by the Nagys do not support their conclusion that the officers should have known that Hawes's report of gunshots was false because they knew she had recently made three false reports to the APD. As to the first "false report," that Nagy had been videotaping the Hawes children, Officer Nason discovered that Nagy's videotape did not include images of the Hawes children, but confirmed that Nagy had in fact been using a video camera outside his home and in the general proximity of the Hawes children. So, there was some basis for Hawes's police report. As to the second "false report," that papers were going to be served on Nagy, that "report" had been made on the same day as the report of gunshots, which means that the police had no

were justified by exigent circumstances, <u>i.e.</u>, a serious threat of injury or death based upon a credible report of several gunshots having been fired, their limited intrusion upon the Nagys' property and their brief seizure of Nagy himself were not unreasonable within the meaning of the Fourth Amendment and did not violate the Nagys' constitutional rights.

reasonable basis for considering the report to be false at the time they had to decide whether to investigate the report of gunshots.  Finally, as to the third "false report," that Nagy had been driving erratically along the driveway, the police had no way of knowing how Nagy had been driving on the driveway other than Hawes's report, and had no basis, other than Nagy's own denial of erratic driving, for believing that Hawes's report was in any way false.  Obviously, if Nagy was driving erratically, it was for the purpose of irritating his neighbors, and the officers' knowledge that Nagy had not been driving erratically later in the day, in Franklin, away from home, is not relevant. In sum, at the time Hawes made her report of gunshots, the police had no reasonable grounds for thinking anything other than that her report was based upon a good faith belief that she had heard gunshots.  The fact that Nagy emerged from his barn carrying a hammer argues for, rather than against, Hawes's good faith; even Nagy cannot claim that Hawes heard nothing and completely fabricated her report.  The sound of hammering upon any number of media, particularly when heard by an anxious neighbor, can easily be mistaken for gunshots.

The Nagys' third constitutional claim stands on a somewhat different footing, but is no more availing than the first two. Here, the Nagys claim that the Andover defendants

> violated Mr. Nagy's clearly-established and constitutionally-protected right under the Fourth and Fourteenth Amendments not to be coerced into following police orders without a lawful basis . . . [by] unlawfully ordering Mr. Nagy to move his motor vehicles and remove boards on his property, and by threatening arrest without lawful authority to do so.

(Am. Compl. ¶ 30.) In their objection to the Andover defendants' first motion to dismiss, the Nagys rely upon Michigan v. Chesternut, 486 U.S. 567 (1988), for the proposition that Officer Nason's threat that he would arrest Mr. Nagy if he did not move his vehicles and lumber was a "clearly established violation of Mr. Nagy's rights under the Fourth Amendment" (Pl.'s Obj. to Mot. to Dismiss (document no. 14) at 13). In Chesternut, the Supreme Court ruled that the police did not seize a person, within the meaning of the Fourth Amendment, by following him in a cruiser after he saw them and took off running. 486 U.S. at 575-76. Chesternut is inapplicable to this case.

16

For their part, the Andover defendants contend that by ordering Nagy to move his vehicles and lumber, the officers did not effect a seizure of that property. The officers were simply taking reasonable steps, within the scope of their authority, to reduce the risk of further confrontation between the Nagys and the Haweses. Finally, the Andover defendants contend that if the police do not violate the constitutional rights of a person they have arrested by threatening to "'knock [his] remaining teeth out of his mouth' if he remained silent," Hopson v. Fredericksen, 961 F.2d 1374, 1378 (8th Cir. 1992), the threat of arrest in this case can hardly rise to the level of a constitutional violation. The court agrees.

As a preliminary matter, Officer Nason's directive to Nagy that he move his trucks and lumber did not constitute a seizure, because that command did not entail a "meaningful interference with [Nagy's] possessory interests in that property," Soldal v. Cook County, Ill., 506 U.S. 56, 61 (1992) (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)); see also United States v.

17

TWP 17 R 4, 970 F.2d 984, 989 (1st Cir. 1992) (citing Maryland v. Macon, 472 U.S. 463, 469 (1985)). According to the Nagys' complaint, the officers never touched Nagy's personalty, and only ordered him to move it from one part of his real estate to another, which renders their interference with Nagy's possessory interests de minimis at worst. See Ford v. Wilson, 90 F.3d 245, 248 (7th Cir. 1996) (de minimis seizures of property); compare TWP 17 R 4, 970 F.2d at 989 (posting warrant of arrest in rem on parcel of real estate did not constitute seizure of the real estate) with Soldal, 506 U.S. at 62 (disconnecting trailer home from utility hook-ups and towing it away was a seizure) and Jacobsen, 466 U.S. at 120 (DEA agents' "assertion of dominion and control over the package and its contents did constitute a 'seizure'").

Not only did the officers not seize Nagy's property, they acted reasonably and lawfully. After determining that Nagy had not fired a gun, the officers noticed two trucks and some lumber on or near the shared driveway. Whether or not those things were

18

actually on the driveway is unimportant.  Even if they were located next to the driveway but not literally on it, the presence of those things in close proximity to the shared driveway gave the officers reason to be concerned about a further escalation of hostilities between the Nagys and the Haweses and a concomitant breach of the peace.  The officers' concerns were entirely reasonable given that: (1) use of the shared driveway was the source of conflict between the two families, and the driveway itself was the apparent battleground; and (2) the first conflict between the Nagys and the Haweses, in June 2000, had involved a claim by Nagy that Hawes's day-care parents had been driving too fast on the driveway and a report by Hawes that Nagy had blocked the shared driveway.  In light of that history, it was prudent for Officer Nason to order Nagy to temporarily move his trucks and lumber.  Because that order did not amount to a seizure, and because "[f]ear or emotional injury which results solely from verbal harassment or idle threats is generally not sufficient to constitute an invasion of an identified liberty interest," Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir. 1991)

19

(citations omitted); <u>see also</u> <u>King v. Olmsted County</u>, 117 F.3d 1065, 1067 (8th Cir. 1997) (quoting <u>Hopson</u>, 961 F.2d at 1378) ("Generally, mere verbal threats made by a state-actor do not constitute a § 1983 claim."), the Nagys can point to neither: (1) an act by Officer Nason that exceeded his lawful authority to take reasonable measures calculated to keep the peace; nor (2) any act violative of their constitutional rights.

Because the Nagys have failed to allege facts under which Officers Nason, Laramie, or Nason undertook an unreasonable search or seizure, they have failed to state a claim under 42 U.S.C. § 1983. Accordingly, Count I of their complaint is dismissed.

II. <u>Count V: The Nagys' Conspiracy Claim</u>

While it is unclear from the Nagys' amended complaint whether Count V asserts a federal or a state law claim for civil conspiracy, their objection to the Andover defendants' first

motion to dismiss (document no. 17) suggests that Count V at least includes a federal claim, under § 1983.

> A civil rights conspiracy as commonly defined is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damages.'" Hampton v. Hanrahan, 600 F.2d 600, 620-21 (7th Cir. 1979), rev'd in part on other grounds, 446 U.S. 754 . . . (1980) (quoting Rotermund v. United States Steel Corp., 474 F.2d 1139 (8th Cir. 1973)).

Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988) (parallel citations omitted). "In order to make out an actionable conspiracy under section 1983, a plaintiff has to prove not only a conspiratorial agreement but also an actual abridgment of some federally-secured right." Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001) (citing Earle, 850 F.2d at 844; Landrigan v. City of Warwick, 628 F.2d 736, 742 (1st Cir. 1980)). Here, the Nagys have failed to allege "an actual abridgment of some federally-secured right," Nieves, 241 F.3d at 53, for the reasons given in the discussion of Count I. Accordingly, their § 1983 conspiracy claim must necessarily fail, as well.

Finally, for the sake of completeness, the court notes that the Nagys have also failed to state a claim for conspiracy under the civil rights conspiracy statute, 42 U.S.C. § 1985(3).

> An actionable section 1985(3) claim must allege that (i) the alleged conspirators possessed "some racial, or perhaps otherwise class-based, invidiously discriminatory animus," Griffin v. Breckenridge, 403 U.S. 88, 102 . . . (1971), and (ii) their alleged conspiracy was "aimed at interfering with rights . . . protected against private, as well as official, encroachment." United Bhd. of Carpenters & Joiners of America v. Scott, 463 U.S. 825, 833 . . . (1983). . . . If no racial animus is charged, a discriminatory class-based animus must be alleged. See Harrison v. Brooks, 519 F.2d 1358, 1359 (1st Cir. 1975) (citing Griffin, 403 U.S. at 102 . . .). "The requirement that the discrimination be 'class-based' is not satisfied by an allegation that there was a conspiracy which affected the interests of a class of persons similarly situated with the plaintiffs. Rather, the complaint must allege facts showing that the defendants conspired against the plaintiffs because of their membership in a class and that the criteria defining the class were invidious." Id. at 1359-60.

Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 34 (1st Cir. 1996) (parallel citations omitted). The Nagys have alleged neither racial animus nor invidious class-based animus on the part of Officer Nason and the Haweses. Thus, while the Nagys generally allege that Officer Nason and the Haweses worked

22

together to harm them, they have failed to state a claim that is cognizable under 42 U.S.C. § 1985(3).  See Harrison, 519 F.2d at 1360 (citing Turner v. Baxley, 354 F.Supp. 963, 973 (D. Vt. 1972) (evidence of animus toward individual is not probative of class-based animus).

Because the Nagys have failed to state a claim under either 42 U.S.C. § 1983 or 42 U.S.C. § 1985(3), Count V, to the extent that it contains a federal claim, is dismissed.


III. The Nagys' Remaining State Law Claims

The counts remaining in this case entail four state law claims – unlawful detention, negligence, trespass, and intentional infliction of emotional distress.  Given that this case is "at an early stage in the litigation," Camelio v. American Federation, 137 F.3d 666, 672 (1st Cir. 1998) (citing Rodriguez v. Doral Mortgage Corp., 57 F.3d 1168, 1177 (1st Cir. 1995)), and in the interest of comity, see Camelio, 137 F.3d at 672 (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)), the court declines to exercise supplemental jurisdiction

23

over the state law claims in Counts II-IV and VI of the amended complaint.

## Conclusion

Because plaintiffs have failed to a state claim on which relief could be granted under either 42 U.S.C. § 1983 or 42 U.S.C. § 1985(3), and because the court declines to exercise supplemental jurisdiction over the remaining state law claims, the Andover defendants' motion to dismiss the amended complaint (document no. 23) and the Haweses' motion to dismiss the amended complaint (document no. 24) are granted without prejudice to filing state claims in a state court of competent jurisdiction. The motions to dismiss the original complaint (document no. 11 and document no. 13) are moot.

The Clerk of the Court shall enter judgment in accordance with the terms of this order and close the case.

24

**SO ORDERED.**


                              _____
                              Steven J. McAuliffe
                              United States District Judge

October 19, 2001

cc:   Bryan K. Gould, Esq.
      Donald E. Gardner, Esq.
      Kris E. Durmer, Esq.