**STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Lynn Eldridge, and Patrick Octuck, Petitioners,**

v.

**Kelly Sullivan DOHERTY and Shannon Sullivan, Respondents.**

Nos. S–12157, S–12277.

Supreme Court of Alaska.

Sept. 14, 2007.

Michael C. Kramer, Borgeson & Burns, PC, Fairbanks, for Respondents.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

Lynn Eldridge, a social worker being sued in her individual capacity, petitions us to reverse the superior court's orders (1) determining that she was not entitled to qualified immunity from a number of claims brought pursuant to 42 U.S.C. § 1983, and (2) precluding her from relitigating the factual issues decided in a prior child in need of aid case. Because it appears that the superior court failed to apply the proper federal test for qualified immunity, we vacate the superior court's order denying Eldridge qualified immunity and remand for further proceedings on this issue. Because Eldridge was neither a party to nor in privity with a party to the prior child in need of aid case, we reverse the superior court's order precluding her from relitigating issues of fact determined in that case.

## II. FACTS AND PROCEEDINGS

### A. Facts

Lynn Eldridge is a social worker employed by the State of Alaska, Department of Health and Social Services, Office of Children's Services (OCS).[1] Kelly Sullivan Doherty is a former resident of Fairbanks. Kelly's minor daughter, Shannon Sullivan, was born on October 10, 2000, and is also a former resident of Fairbanks. The current lawsuit by Kelly and Shannon (the Sullivans) against Eldridge arises from Eldridge's participation in a child in need of aid (CINA) case in which the State unsuccessfully sought to terminate Kelly's parental rights over Shannon.

On August 18, 2001, the Sullivans were treated at Fairbanks Memorial Hospital's emergency room for injuries they had sus-

Megan R. Webb, Assistant Attorney General, Anchorage, and David W. Márquez and Talis J. Colberg, Attorneys General, Juneau, for Petitioners.

---

1. OCS was previously known as the Division of Family and Youth Services.

tained as the result of domestic violence. At the time, Kelly refused to identify the abuser[2] or to avail herself of any of the social services that could have potentially protected her and her daughter from further abuse. As a result, OCS removed Shannon from Kelly's care and placed her in a foster home. Eldridge was assigned as the social worker to the case.

On December 16, 2001, Shannon was adjudicated a child in need of aid. On January 28, 2003, OCS filed a petition in superior court to terminate Kelly's parental rights with regard to Shannon. The superior court then held a twelve-day termination trial.

After the close of the trial, the superior court issued an order denying OCS's petition to terminate Kelly's rights and criticizing the manner in which OCS and its social workers had pursued the case. In the superior court's words, the case was "remarkable" and had been investigated and prosecuted unlike "any other termination case the Court ha[d] ever heard."

In its findings of fact and conclusions of law, the superior court detailed the novelty of the case. According to the superior court, OCS had failed to fulfill its responsibilities at nearly every stage of the CINA process. Before trial, "the social workers, the Office of Children's Services, licensing authorities, and the foster mother ha[d] done more to undermine the parent's progress and reunification efforts" than in any other case the superior court had ever heard.[3] At trial, some parts of OCS's case were based largely on innuendo and reminded the superior court of "the Army–McCarthy hearings."

With regard to Eldridge, the superior court found that she had improperly instructed other social workers not to call or remind Kelly of her appointments and had improperly terminated Kelly's visits with her daughter. According to the superior court, Eldridge did not want Kelly to succeed in her efforts to regain custody of Shannon and was likely biased against Kelly because of Kelly's second job as an adult dancer. The superior court also found that OCS and its social workers had failed to protect Shannon by not acting on concerns about the foster mother or repeated recommendations that Shannon should be removed from the foster home.

Ultimately, the superior court concluded that Shannon was no longer a child in need of aid and ordered OCS to "immediately begin plans for reunification so that the child may be returned to the mother."

## B. Proceedings

The Sullivans filed their initial complaint for damages against Eldridge on October 22, 2004.[4] In this complaint, the Sullivans leveled an array of state and federal claims against Eldridge, including two claims brought pursuant to 42 U.S.C. § 1983[5] that Eldridge had violated the Sullivans' rights to due process under the United States Constitution. In support of their claims, the Sullivans attached a number of documents from the original CINA case, including the superior court's findings of fact and conclusions of law in which it criticized OCS and its social workers and declined to terminate Kelly's parental rights.

Eldridge filed an answer to the complaint on January 14, 2005. In her answer, El-

2. Kelly later identified the abuser as a state trooper trainee and explained that she had initially refused to identify him out of fear.

3. Similarly, the superior court found that OCS had "totally failed in fulfilling its concurrent planning obligation."

4. Kelly's original suit also named OCS and Patrick Octuck as defendants. However, neither OCS nor Octuck is a party to this appeal. At the time petitions for interlocutory review were filed in this case, the Sullivans' only claim against OCS had been dismissed. After petitions for review were filed, the Sullivans' only claim

against Octuck was settled. Therefore, this appeal concerns only Eldridge.

5. 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

dridge denied many of the Sullivans' factual claims and asserted several affirmative defenses, including the defense of immunity.

On January 25, 2005, the Sullivans filed a motion in limine asking the superior court to preclude Eldridge, under the doctrine of collateral estoppel, from relitigating the findings of fact from the original CINA case. Eldridge opposed this motion on April 22, arguing, among other things, that collateral estoppel did not apply because she was neither a party to nor in privity with a party to the CINA proceeding. The Sullivans replied that Eldridge was in privity with OCS because she had been a key individual in initiating the CINA proceedings, had been a key witness at the termination trial, and had been adequately represented by OCS at the termination trial.

On May 13, 2005, Eldridge filed a motion to dismiss, arguing, in relevant part, that she was entitled to absolute quasi-prosecutorial immunity with regard to the Sullivans' § 1983 claims. The Sullivans opposed the motion and argued that, under the facts of the case, Eldridge was entitled to neither absolute nor qualified immunity. Eldridge replied and reasserted that she was entitled to absolute quasi-prosecutorial immunity.

On October 26, 2005, the superior court issued a memorandum decision granting the Sullivans' motion for collateral estoppel. With regard to the issue of privity, the court concluded that "there is no question that [OCS's] attorney was in the position of defending the actions of its social workers." It also noted that "Eldridge was the State's primary witness and testified at length about the actions she had taken throughout the time Shannon was in state custody."

On October 27, 2005, the superior court issued a memorandum decision in which it found, in relevant part, that (1) Eldridge was not shielded by either absolute or qualified immunity, and (2) the Sullivans had pled "facially valid § 1983 claim[s]." As such, the superior court denied Eldridge's motion to dismiss the Sullivans' § 1983 claims.

On November 7, 2005, Eldridge moved for reconsideration, arguing that the superior court had applied the wrong standard for determining her immunity to the Sullivans' § 1983 claims. According to Eldridge, the superior court applied state immunity law when it should have applied federal immunity law. The Sullivans objected to the motion for reconsideration, arguing that the superior court's discussion of Eldridge's qualified immunity "occurred in a portion of its order addressing state law claims only" and "did not directly discuss the doctrine [of] qualified immunity as applied to [their § 1983] claims." The superior court effectively denied this motion by declining to rule on it.[6]

On the same day that she moved for reconsideration, Eldridge also filed a motion requesting that the superior court clarify which of the factual findings from the CINA case would be given preclusive effect. According to Eldridge, this clarification was necessary to facilitate an appeal. Over the objections of the Sullivans, the superior court issued an order on March 17, 2006, detailing forty-seven factual findings that could not be relitigated at trial and explaining that the jury would be instructed to assume that each of these facts were true.

Eldridge subsequently filed two petitions for interlocutory review, requesting that we reverse the superior court's orders (1) denying Eldridge qualified immunity with regard to the Sullivans' § 1983 claims, and (2) granting the Sullivans' motion for collateral estoppel. We agreed to hear both petitions.

## III. STANDARD OF REVIEW

 Whether an individual is entitled to immunity for a § 1983 claim is a question of law that we review de novo, using our independent judgment.[7] Whether collateral estoppel applies to a particular set of facts is

---

**6.** Alaska Rule of Civil Procedure 77(k)(4) provides, in relevant part:

 If the motion for reconsideration has not been ruled upon by the court within 30 days from the date of the filing of the motion, or within 30 days of the date of filing of a response request by the court, whichever is later, the motion shall be taken as denied.

**7.** *Mabe v. San Bernadino County, Dep't of Pub. Soc. Servs.,* 237 F.3d 1101, 1106 (9th Cir.2001).

also a question of law that we review using our independent judgment.[8]

## IV. DISCUSSION

### A. Qualified Immunity

■ Both federal and state law maintain that executive officials who perform discretionary functions may be shielded from liability for civil damages on the basis of qualified immunity. However, the relevant legal standards applicable to and tests for qualified immunity vary with the nature of the claim asserted against the executive official.

In the case at hand, Eldridge argues that the superior court applied the incorrect legal standard when it determined that she was not entitled to qualified immunity from the Sullivans' § 1983 claims. According to Eldridge, the superior court applied the state test for state law tort claims when it should have applied the federal test for federal statutory and constitutional claims. As evidence, she points to the superior court's lengthy discussion and application of Alaska's three-prong test for immunity from state law tort claims.

The Sullivans do not dispute that the superior court discussed the test for qualified immunity from state law tort claims, but insist that this discussion must be read in context. They note that the superior court's determination that Eldridge was not entitled to qualified immunity was included in a comprehensive memorandum decision that covered a wide variety of claims and defenses, brought under both state and federal law. Consequently, they argue, the fact "[t]hat Judge Wood discussed the state standard for

qualified immunity in one part ... of his comprehensive memorandum decision does not mean that he applied this standard to the § 1983 claims discussed separately [in another part]." According to the Sullivans, the superior court adequately resolved the federal immunity question in the section of its memorandum decision dedicated exclusively to their § 1983 claims.

■ Under federal law, qualified immunity shields "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[9] The United States Supreme Court has established a two-prong test for resolving claims of qualified immunity.[10] First, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officers' conduct violated a constitutional right?"[11] Second, "if so, was that right clearly established?"[12] In determining whether a right is clearly established, the relevant inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[13] This inquiry should be objective and based upon the specific factual circumstances of the case at hand.[14] The burden of establishing that a right is clearly established falls upon the plaintiff.[15]

■ Under our case law, courts faced with a defense of immunity from state law tort claims must determine: (1) does official immunity apply to the official's conduct; (2) if so, is the immunity absolute or qualified; and

---

8. *Chilton–Wren v. Olds,* 1 P.3d 693, 696 (Alaska 2000).

9. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

10. We note that we have chosen generally to "follow federal precedent for determining whether qualified immunity should be conferred for executive acts alleged to contravene a [state] statutory or constitutional mandate." *Breck v. Ulmer,* 745 P.2d 66, 71–72 (Alaska 1987).

11. *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose,* 402 F.3d 962, 971 (9th Cir.2005) (quoting *Saucier v. Katz,* 533 U.S. 194,

201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)); *see also City of Fairbanks v. Rice,* 20 P.3d 1097, 1109 (Alaska 2000) (explaining federal qualified immunity).

12. *San Jose Charter of Hells Angels Motorcycle Club,* 402 F.3d at 971 (quoting *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151).

13. *Id.*

14. *Id.*

15. *Devereaux v. Perez,* 218 F.3d 1045, 1051 (9th Cir.2000), *aff'd en banc sub nom. Devereaux v. Abbey,* 263 F.3d 1070 (9th Cir.2001).

(3) if it is only qualified, did the official act in a corrupt or malicious manner or in bad faith.[16] This test is distinct from the federal test and involves a line of inquiry that the United States Supreme Court has specifically rejected—namely, the inquiry into the subjective intentions of the government official.[17]

As both the Sullivans and Eldridge agree, the superior court discussed the test for qualified immunity from state law tort claims at great length in the section of its memorandum decision labeled "Eldridge is entitled to qualified immunity only." In this section, the superior court set out the three-part test for immunity from state law tort claims, applied that test to Eldridge, and concluded that Eldridge was not shielded by qualified immunity because the Sullivans had "adequately alleged that Eldridge acted in bad faith." Although the Sullivans insist that the court's application of state immunity law in this section of its decision was intended only to address Eldridge's claims of immunity from their state law tort claims, nothing in the text of the superior court's decision evinces such a limited intention. This is the only section of the superior court's decision in which immunity is explicitly discussed, and it concludes with a statement denying Eldridge's motion to dismiss a number of the Sullivans' claims, including their claims under § 1983.

■ The Sullivans nonetheless argue that the superior court adequately addressed the issue of federal qualified immunity in a later section of its memorandum decision. But the section of the superior court's decision that the Sullivans point to is explicitly dedicated to determining whether the Sullivans had

pled a facially valid claim under § 1983. Although the test for a facially valid § 1983 claim and the test for federal qualified immunity both require the court to ask whether the plaintiff has shown a violation of a right, the two tests have little else in common.[18] Unlike the test for qualified immunity, the test for a facially valid § 1983 claim does not require the court to consider whether the constitutional right in question was clearly established or whether a reasonable officer would have known that his or her conduct violated that right.[19] And, indeed, this later section of the superior court's decision—a section explicitly dedicated to determining whether the Sullivans had pled a facially valid § 1983 claim—does not make either of these determinations.

■ In the end, there is nothing in the superior court's decision to indicate that the superior court applied the proper federal test. Because the "defenses to a federal cause of action are defined by federal law,"[20] the superior court's determination that Eldridge is not entitled to qualified immunity from the Sullivans' § 1983 claims cannot be sustained.

Eldridge maintains that we should not apply the federal test for qualified immunity on appeal and should instead remand the issue back to the superior court for further litigation. According to Eldridge, such a remand is necessary because claims of federal qualified immunity must be analyzed within the context of the specific facts of the case, and she has not yet had a chance to develop those facts. In her words, she "has had no opportunity to actually litigate the defense (i.e., provide affidavits, deposition testimony, or

**16.** *Alpine Indus., Inc. v. Feyk*, 22 P.3d 445, 447–48 (Alaska 2001).

**17.** *Harlow*, 457 U.S. at 817–18, 102 S.Ct. 2727 (concluding that "allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery" and articulating an objective test for qualified immunity).

**18.** *See Crawford v. Kemp*, 139 P.3d 1249, 1255 n. 10 (Alaska 2006) (explaining that a § 1983 claim can only be sustained if the plaintiff shows: "(1) that the conduct complained of was committed by a person acting under color of state law, and

(2) that the conduct deprived the plaintiff of a constitutional right") (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1988)).

**19.** *Id.*

**20.** *Van Sandt v. Brown*, 944 P.2d 449, 452 n. 5 (Alaska 1997) (citing *Howlett v. Rose*, 496 U.S. 356, 375–76, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990)); *see also Martinez v. California*, 444 U.S. 277, 284, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) ("It is clear that the California immunity statute does not control this [§ 1983] claim even though the federal cause of action is being asserted in the state courts.").

other relevant documentary evidence)." Eldridge explains that she has not yet had this opportunity because of the specific manner in which the superior court addressed the issue. As Eldridge points out, her motion to dismiss was based not on the defense of qualified immunity, but on the defense of absolute immunity. As such, the superior court's decision that Eldridge was not shielded by either absolute or qualified immunity from the Sullivans' § 1983 claims actually went beyond the scope of Eldridge's motion.[21] And, according to Eldridge, "[s]ince she had not sought summary judgment on qualified immunity, she did not submit relevant documentary evidence in support of this defense."[22]

Eldridge is correct to note that the specific facts of the case are relevant to the resolution of her qualified immunity defense. As the Ninth Circuit has explained, the inquiry into whether a reasonable officer would know that his conduct was unlawful is a wholly objective inquiry that should be "undertaken in light of the specific factual circumstances of the case."[23] In fact, the United States Supreme Court has specifically stated that, at least with regard to law enforcement officers and warrantless searches, the reasonableness of the official's actions should be assessed in light of the information that the official possessed at the time he or she took those actions.[24] And, as Eldridge points out, she may be able to submit documentary evidence that would be relevant to the objective reasonableness of her actions. For instance, she notes that there may be OCS policies in place that could explain her decision to terminate the Sullivans' visitation sessions.

Because Eldridge has not yet had the opportunity to submit relevant documentary evidence, we decline to apply the federal test for qualified immunity and instead vacate the superior court's order and remand the issue for further proceedings.

### B. Collateral Estoppel

■■■ As we have explained in the past, collateral estoppel, or issue preclusion, prohibits a party from relitigating an issue of fact only if four factors are met:

(1) the party against whom the preclusion is employed was a party to or in privity with a party to the first action; (2) the issue precluded from relitigation is identical to the issue decided in the first action; (3) the issue was resolved in the first action by a final judgment on the merits; and (4) the determination of the issue was essential to the final judgment.[25]

Eldridge maintains that the superior court erred when it granted the Sullivans' motion to preclude her from relitigating forty-seven factual findings from the original CINA case. According to Eldridge, she should not be collaterally estopped because she was not a party to or in privity with a party to the CINA case. Moreover, she contends that applying collateral estoppel against social workers sued in their personal capacity "would inject improper focus into CINA proceedings."

The Sullivans disagree and assert that the superior court correctly found that Eldridge was in privity with OCS. According to the Sullivans, "[t]here is no question that it was

**21.** Although Eldridge had touched upon the issue of qualified immunity in her opposition to the Sullivans' motion for partial summary judgment, the superior court decided the issue of qualified immunity in its ruling on Eldridge's motion to dismiss, which was based only on absolute immunity.

**22.** Moreover, Eldridge could not have submitted any evidence in support of the defense of qualified immunity without the superior court converting her motion to dismiss into a motion for summary judgment. *See* Alaska R. Civ. P. 12(c) (stating that "[i]f ... matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment").

**23.** *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose,* 402 F.3d 962, 971 (9th Cir.2005).

**24.** *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (noting that a determination of "whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials").

**25.** *Powers v. United Serv. Auto. Ass'n,* 6 P.3d 294, 297 (Alaska 2000).

in [OCS's] interest in the CINA case to fully defend Eldridge's actions because Eldridge's dealings with Kelly were the central issue." The Sullivans also assert that "[t]here is no question that Eldridge had notice of the proceedings and an opportunity to be heard on the collaterally estopped issues." They note that Eldridge attended every day of the trial and testified for four days; that many of the factual findings from the CINA case were based upon either Eldridge's testimony or documents that Eldridge had prepared; and that Eldridge "controlled [OCS's] presentation of evidence in the CINA case."

■ The majority of courts maintain that government employees, in their individual capacities, are generally not in privity with the government and are not bound by adverse determinations against the government.[26] This is because the interests, incentives, and immediate goals of a government employee in his or her individual capacity will most often be dissimilar from those of the government or even from those of that same employee in his or her official capacity.[27] As a result, cases brought by or against the gov-

ernment or its employees in their official capacities will not usually provide a proper forum or even the slightest opportunity for a government employee to protect his or her own personal interests. And as a matter of sound policy, this is how it should be. For when the government enters the courthouse in order to prosecute criminal conduct or protect a child in need of aid, it should not be distracted from its purpose by the personal interests of its employees.[28]

While the Sullivans seem to recognize that government employees acting in their personal capacities are generally not in privity with the state, they insist that this "general rule" is not an "*automatic* bar to privity with a government entity" and that courts must "come[ ] to a conclusion based on the facts of the particular case." As evidence, the Sullivans point to a handful of cases in which courts have concluded that public officials acting in their personal capacities were, in fact, in privity with the state. However, as Eldridge notes, these cases largely involved instances of government employees using col-

**26.** *See Bilida v. McCleod,* 211 F.3d 166, 170–71 (1st Cir.2000) (noting that "most precedent indicates that individual state officials are not bound, in their individual capacities, by determinations adverse to the state in prior criminal cases"); *see also Turpin v. County of Rock,* 262 F.3d 779, 782–83 (8th Cir.2001) (stating that "[c]ollateral estoppel cannot be used against the officers . . . as the officers were neither parties nor in privity with the State in the criminal action and did not have a full and fair opportunity to litigate the issues in the criminal action"); *Smith v. Holtz,* 210 F.3d 186, 199 n. 18 (3d Cir.2000) (concluding that "the defendants in their individual capacities . . . are not in privity with the government"); *Morgan v. Gertz,* 166 F.3d 1307, 1309 (10th Cir.1999) (holding that a social worker and police detective were not in privity with the State and were therefore not precluded from relitigating findings that the plaintiff's constitutional rights had been violated); *Gray v. Lacke,* 885 F.2d 399, 405 (7th Cir.1989) (concluding that to the extent county officials were sued in their individual capacities, they were not in privity with the county); *Harris v. Jones,* 471 N.W.2d 818, 820 (Iowa 1991) (noting that the court was "aware of no case in which a person, sued individually, has been estopped to litigate an issue because of a ruling adverse to the State in a prior criminal prosecution"); *Brown v. Osier,* 628 A.2d 125, 128 (Me.1993) (noting that "an official sued in his individual capacity is generally not considered to be in privity with the government")

(quoting *Cohen v. Shea,* 788 F.Supp. 66, 68 (D.Mass.1992)); *Lamb v. Geovjian,* 165 Vt. 375, 683 A.2d 731, 734 (1996) (recognizing that a "public official sued in her individual capacity is generally not considered to be in privity with the government for the purpose of res judicata"); 18A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 4458 (2d ed.2002) (stating that "[t]he relationships between a government and its officials justify preclusion only as to litigation undertaken in an official capacity").

**27.** *See Bilida,* 211 F.3d at 170–71 (explaining that "the interests and incentives of the individual police or officials are not identical to those of the state, and the officers normally have little control over the conduct of a criminal proceeding"); RESTATEMENT (SECOND) OF JUDGMENTS § 36 cmt. a (1982) (noting that "[a] legal capacity other than one's individual capacity is by definition representative of interest of others").

**28.** We also note that we have previously adopted portions of the *Restatement (Second) of Judgments'* approach to privity. *Powers,* 6 P.3d at 297–98. The Restatement maintains that a "party appearing in an action in one capacity, individual or representative, is not thereby bound by or entitled to the benefits of the rules of res judicata in a subsequent action in which he appears in another capacity." RESTATEMENT (SECOND) OF JUDGMENTS § 36(2) (1982).

lateral estoppel in a defensive manner to prevent plaintiffs from relitigating issues that had already been unsuccessfully litigated against the same government employees in different capacities, other government employees, or the government entities themselves.[29] As such, these cases did not raise the same sort of fairness and policy concerns that are present in cases such as the one at hand-they neither bound a litigant to the adverse determinations of a case to which he or she was not a party nor burdened the government with concerns about its employees' personal interests.

Ultimately, we find no reason in this case to deviate from the "general rule" that employees acting in their personal capacities are not in privity with the government and are not bound by adverse determinations against the government. Indeed, the facts of this case are such that even under our standard case law, Eldridge cannot be understood to have been in privity with the state. As we explained in *Powers v. United Services Automobile Ass'n,* a non-party will be found to have been in privity with a party to a prior legal proceeding only if that non-party "(1) substantially participated in the control of a party's presentation in the adjudication or had an opportunity to do so; (2) agreed to be bound by the adjudication between the parties; or (3) was represented by a party in a capacity such as trustee, agent, or executor."[30] Here, Eldridge did not agree to be bound by the adjudication and was not represented by a party in a capacity such as trustee. And, contrary to the Sullivans' contentions, the fact that Eldridge drafted and signed the initial petition to terminate Kelly's parental rights, prepared records, and testified at the termination trial, does not mean that Eldridge had control over the litigation or the ability to pursue her personal interests. Eldridge was therefore not afforded a full and fair opportunity to litigate the issues of fact and cannot be precluded from relitigating these issues.[31]

## V. CONCLUSION

For the reasons detailed above, we VACATE the superior court's order denying Eldridge qualified immunity from the Sullivans' § 1983 claims and REMAND for further proceedings in accordance with this decision. We also REVERSE the superior court's order precluding Eldridge from relitigating factual issues determined in the previous CINA proceeding and REMAND for further proceedings in accordance with this decision.

---

**29.** *See, e.g., Powell v. Snyder,* 84 Fed.Appx. 650, 651–52, 2003 WL 22977486 (7th Cir.2003) (unreported) (barring, under the doctrine of res judicata, a state prisoner's suit against prison officials because he had already unsuccessfully litigated the same claims against the Department of Corrections). We also briefly note that the bulk of cases cited by the Sullivans were, like *Powell,* unreported and carry no precedential weight.

**30.** 6 P.3d at 298 (citing RESTATEMENT (SECOND) OF JUDGMENTS §§ 39–41 (1982)).

**31.** *See id.* (concluding that collateral estoppel did not apply, in part, because the litigant had not been afforded "meaningful notice and an opportunity to be heard").